IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. TDC-19-290 |
| | * | |
| MARQUIS VON CLEMONS, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*\*\*\*\*\*\*

## GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorneys, hereby submits the Government's Response to Defendant's Sentencing Memorandum. For the reasons provided in the Government's Memorandum in Aid of Sentencing and as set forth below, the Government submits that a sentence of **115 months in prison, followed by 3 years of supervised release,** is a sentence sufficient but not greater than necessary to satisfy the goals of sentencing.

## Argument

A significant portion of the Defendant's sentencing memorandum is devoted to COVID-19 and its alleged effects both on Clemons' current incarceration at CTF and his likely future incarceration in the Bureau of Prisons.[1] As such, the Defendant makes a *de facto* compassionate

---

[1] The Defendant also asks this Court to give him a criminal history category of V as either a formal overrepresentation departure under U.S.S.G. § 4A1.3(b) or as the basis of a variant sentence. The Defendant's extensive criminal history, PSR ¶¶ 43-51, demonstrates that a criminal history category VI does not "over-represent[] the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes"—as exemplified by the Defendant returning while on probation to twice rob the same bank. U.S.S.G. § 4A1.3(b). Nonetheless, should the Court determine that a criminal history category V is appropriate, such that the Defendant's guidelines are 84 to 105 months, the Government submits that a sentence at the high-end of the guidelines—105 months—is sufficient but not greater than necessary to satisfy the goals of 18 U.S.C. § 3553(a), based on the arguments set forth in the Government's sentencing memorandum. *See* ECF No. 40.

1

release argument disguised as a sentencing memorandum. Neither the § 3553(a) factors nor COVID-19 militate in favor of a sentence less than 115 months in prison for the Defendant.

## I. The Defendant's Pretrial Detention at CTF Does not Warrant a Downward Departure

Starting with the Defendant's pretrial detention at CTF, the Defendant does not argue that he was afflicted with COVID-19 while in pretrial detention, exposed to an individual with COVID-19, nor that he currently needs medical treatment and is not receiving it. The Department of Corrections ("DOC") has implemented a number of precautionary measures based on guidance from the D.C. Department of Health and the Centers for Disease Control ("CDC") to mitigate the risks associated with COVID-19, including restrictions on visitation to the facility, screening and quarantine of inmates, increased provision of masks and other personal protective equipment ("PPE") to staff and inmates, continued education of staff and inmates about the spread of COVID-19 and ways to combat it, cancellation of group activities, and restrictions on out-of-cell time. *See* https://doc.dc.gov/page/coronavirus-prevention (last accessed September 4, 2020).[2]

The Defendant's motion simply recounts the deficiencies identified by Judge Kollar-Kotelly that DOC had been ordered to remediate under the close supervision of the United States District Court for the District of Columbia. *See generally*, *Banks v. Booth*, CKK-20-849 (D.D.C.), ECF No. 49 (Mem. Op.) In response to the deficiencies identified by Judge Kollar-Kotelly, on April 17, 2020, DOC Director Quincy L. Booth issued a memorandum to all employees and contractors entitled "Reminders and Updated COVID-19 Policies and Procedures." *See Banks*, Report Submitted by *Amicus Curiae* Pursuant to April 9, 2020 Consent Order, ECF 47, Ex. 11.

---

[2] The DOC webpage is updated regularly with announcements, policy descriptions, and answers to frequently asked questions.

Director Booth's memorandum, which directly addresses many of the concerns raised by the independent inspectors as part of the *Banks* litigation, both reminds staff of existing procedures and provides several updated procedures, including enforcing social distancing, restricting resident out of cell time, increased education about and use of personal protective equipment, improved conditions within isolation units (including showers and access to legal calls), improvements related to unit common area and cell cleaning, improvements to linen and laundry exchanges, increased contractor and staff screening and hygiene, increased access to legal calls, identification of those in need of medical care, and additional measures. *Id.*

Indeed, as reflected by the slowed rates of positive inmates, *see United States v. Attia*, PWG-19-193 (D. Md. May 22, 2020), ECF No. 67 ("The rate of infection at CTF peaked on April 5 and began to decline on April 16."), the conditions at CTF have already demonstrably improved. As Judge Grimm recognized, "[t]he conditions at CTF have improved, such as inmates' increased access to medical care who are in isolation and quarantine and increased access to cleaning supplies and equipment." *See id.* at 7-8. As has been recognized by numerous courts in this District, COVID-19 is not a problem that afflicts DOC facilities alone. *See United States v. Remarque,* PX-19-39 (D. Md. April 27, 2020), ECF No. 100, at 6-7 ("Finally, this decision in no way minimizes the unprecedented threat that COVID-19 has befallen on our community, country, and world, including places of confinement. For some individuals, the virus visits profound suffering, illness, and even death. This cold reality, however, does not permit the Court to cast the Bail Reform Act aside, but rather to follow it with special care to the individualized circumstances presented. When doing so here, the balance simply does not tilt in favor of Remarque's release."); *United States v. Lee*, ELH-19-159 (D. Md. April 24, 2020), ECF No. 97, at 13-14; *United States v. Gray*, GJH-19-0407 (D. Md. April 1, 2020), ECF 120 ("COVID-19 is not a virus that has

specifically attacked the D.C. Jail but, rather, a global pandemic that all citizens of the world are struggling to combat. There is no reason for the Court to believe that the jail is not taking reasonable precautions to prevent spread within the facility nor is there reason to believe that [the defendant] would not be provided with appropriate medical care if he were unfortunate enough to join the hundreds of thousands of people who have been inflicted with the virus.")

Accordingly, the sole fact that the Defendant was detained at CTF while a pandemic raged both outside and inside prison does not provide an individualized basis to impose a below-guidelines sentence for this Defendant. To wit, the Defendant cites no legal authority that the existence of COVID-19 alone—without some particularized harm to this Defendant—provides a basis for such a downward departure. *Cf. United States v. Pressley*, 345 F.3d 1205, 1219 (11th Cir. 2003) (finding that defendant's *six years* in presentence confinement that included five years of 23 hour-a-day lockdown was a sufficient basis for district court to provide downward departure); *United States v. Sutton*, No. CRIM. 07-426 (KSH), 2007 WL 3170128, at *4 (D.N.J. Oct. 25, 2007) (providing a downward variance based on the unique nature of the pretrial conditions at a county jail in New Jersey).

## II. The Defendant's Likely Placement in BOP Custody Does not Advocate for a Downward Departure

Similarly, the Bureau of Prisons ("BOP") has taken aggressive action to mitigate the danger of COVID-19. In early 2020, the agency established a COVID-19 working group to develop responsive procedures in consultation with experts from the Centers for Disease Control ("CDC"). On August 5, 2020, the Bureau of Prisons implemented Phase Nine of its Action Plan ("action plan") in order to minimize the risk of COVID-19 transmission into its facilities, extending prior mitigation measures, to include enhanced modified operations for all institutions, and to implement

new measures to manage the pandemic.[3] Phase Nine is scheduled to remain in place through August 31, 2020.[4] The action plan comprises several preventive and mitigation measures, including the following:

> **Screening of Inmates and Staff:** All new BOP inmates are administered an approved viral PCR test for COVID-19, and screened for symptoms and risk of exposure. Inmates who test positive and/or are symptomatic will be placed immediately in medical isolation, where they will remain until they meet the CDC symptom or time-based release from isolation criteria. New inmates who test negative and are asymptomatic are placed in quarantine for 14 days, and are not released to general population unless they test negative and are asymptomatic.
>
> **Contractor Access:** Contractor access to BOP facilities is restricted to only those performing essential services (including medical or mental health care) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization from the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened using the same procedures as applied to staff prior to entry.
>
> **Quarantine Logistics:** The action plan directs all BOP institutions to assess their stockpiles of food, medicines, and sanitation supplies and to establish quarantine areas within their facilities to house any detainees who are found to be infected with or at heightened risk of being infected with coronavirus pursuant to the screening protocol.
>
> **Suspension of Social Visits and Tours:** BOP has placed a 30-day hold on all social visits, such as visits from friends and family, to limit the number of people entering the facility and interacting with detainees. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended for at least the first 30 days that the action plan is in effect.
>
> **Legal Access:** BOP facilities are accommodating telephone and video conferences to the extent possible. Facilities have been instructed that, consistent with standing guidance, legal visits should be accommodated upon request, based on local resources. During in-person visits, inmates and attorneys or other legal visitors should wear face coverings and perform hand hygiene before and after. BOP strongly recommends facilities use Plexiglas or similar barrier between the inmate and legal visitor, and practice social distancing in the absence of a barrier. Legal

---

[3] The BOP's Phase Nine Action Plan is available at https://www.bop.gov/foia/docs//COVIDphase9_08052020.pdf (accessed August 27, 2020).

[4] The Bureau of Prisons has extended and enhanced its modified operations plans since the onset of the novel coronavirus pandemic, and the government expects these efforts will continue in subsequent phases of the action plan.

visitors are symptom and temperature screened upon entry, and documents are to be passed without physical contact. Tables, chairs, and other high-touch surfaces are to be disinfected between usages. Inmates in medical isolation for COVID-19 should not have in-person legal visits unless absolutely necessary, and inmates in quarantine should delay visits until after quarantine.

**Inmate Movement:** BOP is taking a number of steps to reduce the risk of COVID-19 exposure and transmission for inmates or staff during inmate movement. Inmates are to be tested for COVID-19 and quarantined for 14 days prior to any transportation. In moving inmates between institutions, BOP is working to avoid movement variables that increase the risk of COVID-19 exposure and transmission, including mandatory face coverings, avoiding multiple stops, and avoiding mixing between inmates being transported and other inmate groups. Inmates who have tested positive are not permitted to travel until they have met the CDC symptom or time-based criteria for release from isolation. Transferred inmates will undergo the same process as new intakes, including COVID-19 testing, screening, and temperature checks. Likewise, all official staff travel has been cancelled, as has most in-person staff training.

**Compliance Reviews:** BOP will be conducting unannounced site visits to ensure institution operations conform to ongoing COVID-19 mitigation guidance and the BOP action plan.

**Modified Operations:** Finally, the action plan requires wardens at BOP facilities to modify operations in order to maximize social distancing.[5]

The measures enumerated in the action plan, and the expansion of COVID-19 testing, are designed to sharply mitigate the risk of COVID-19 transmission into BOP facilities.

Further, the legislature, Department of Justice, and BOP have recently evidenced their commitment to protecting inmates in light of COVID-19. For instance, in response to the COVID-19 outbreak, Congress expanded the BOP's statutory authority to reduce sentences to home confinement. Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, § 12003(b)(2) (Mar. 27, 2020) (allowing the BOP to "lengthen the maximum amount of time the Director is authorized to place a prisoner in home confinement" under 18 U.S.C. § 3624(c)(2)). Continuing this trend, the Attorney General has ordered the BOP to broadly exercise

---

[5] Further details are available at http://www.bop.gov/coronavirus/covid19_status.jsp, and at the regularly updated resource page, http://www.bop.gov/coronavirus/.

its authority to reduce sentences to home confinement and protect inmates in BOP custody, taking into consideration inmates' ages, vulnerabilities to COVID-19, and other relevant factors. Attorney General, Mem. for Dir. of BOP, Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 (April 3, 2020) (directing BOP to maximize prisoner transfers to home confinement at FCI Oakdale, FCI Danbury, FCI Elkton and other facilities whose operations BOP determines are materially affected by the virus); Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic (Mar. 26, 2020). In other words, by policy, regulation, statute, and order from the Attorney General, the BOP is taking seriously the need to protect inmates from this very serious virus.

In his sentencing memorandum, the Defendant makes generalized and amorphous arguments as to the conditions in BOP facilities to argue that he should receive a downward departure. While the Government concedes that the Defendant's obesity is an "at risk" factor enumerated on the CDC's website,[6] *see* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed September 4, 2020), the Defendant's overall ability to care for himself is unquestioned and the Defendant does not allege that his immune system has been compromised in any way. Neither does the Defendant's age, at 37 years old, make him particularly vulnerable to COVID-19. Where the Defendant has failed to establish a particularized risk of contracting COVID-19 at a BOP facility, the Government submits that a downward variance based solely on the speculative possibility that the Defendant might contract COVID-19 while incarcerated is not warranted.[7] *See United States v. Aminika Wright,*

---

[6] Leading up to sentencing, the Defendant was diagnosed with diabetes as well, which depending on the type of diabetes, may also place the Defendant in either the "at risk" or "might be at risk" categories.

[7] As discussed in the Government's Memorandum in Aid of Sentencing and below, the Defendant is a career bank robber, and as such cannot capitalize on the fact that COVID-19 exists and generic

TDC-19-035 (D. Md. May 21, 2020), ECF No. 51 at 6 (denying compassionate release for 66-year-old defendant with diabetes, hypertension, chronic kidney disease, asthma, and obesity and noting that "While the Court does not consider the actual presence of COVID-19 within a prison to be a necessary prerequisite for a finding that an inmate with a high-risk medical condition should be released based on extraordinary and compelling reasons, the fact that there [were no cases at the defendant's BOP institution] reduces the imminence of the risk to [the defendant] and must be considered.") *See, e.g., United States v. Larry Barringer*, PJM-13-129 (D. Md. May 20, 2020), ECF No. 91 (denying compassionate release to defendant with hypertension, diabetes, chronic kidney disease, and extreme obesity).

In contrast to the Defendant's generic arguments of harm from COVID-19—pretrial or post-sentencing—in arguing for a below guidelines sentence of five years, the particularized arguments raised by the Government pursuant to the § 3553(a) factors demonstrate the necessity of a sentence at the top of the guidelines for this Defendant. The Defendant's PSR evidences a lengthy involvement in crime—ranging from drugs to robbery and theft. The Defendant's repeated use of firearms, violence, and threats of these two to commit his robberies demonstrates the seriousness of not only the Defendant's criminal activities, but also the criminal conduct for which the Defendant finds himself before the Court today. For his continued engagement in recidivism, his use of threats and violence against individuals in order to carry out his crimes, and the Defendant's decision to twice rob the same bank that he was on probation for previously robbing, the sentencing range proposed by the United States Sentencing Guidelines table continues to be appropriate and a sentence of 115 months is sufficient but not greater than necessary in light of the

---

arguments of harm to argue for a below guidelines sentence. If there is a time and place where COVID-19 demonstrably affects his incarceration or health, the Defendant can always move for compassionate release to the extent there is such a basis for him to argue for release on that ground.

history and characteristics of the Defendant, to reflect the seriousness of the offense, to promote respect of the law, to provide just punishment, to hopefully deter the Defendant from engaging in future criminal conduct, and to protect the public from further crimes of the Defendant.

## **Conclusion**

For the foregoing reasons, the reasons set forth in the Government's Memorandum in Aid of Sentencing, and additional information that may be presented at the sentencing hearing, the Government respectfully submits that a sentence of 115 months, followed by 3 years of supervised release, is sufficient but not greater than necessary to meet the purposes of sentencing as enumerated in the § 3553(a) factors.

Respectfully submitted,

Robert K. Hur
United States Attorney

By: \_\_\_\_/s/_____
Rajeev R. Raghavan
Dana J. Brusca
Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing was filed electronically on September 4, 2020, and thus served upon defense counsel.

/s/
Rajeev R. Raghavan
Assistant United States Attorney